Thank you, Your Honor, and the Court and Council, good morning. My name is Greg Miller, and with me at Council table is Randy Johnson. We're from the firm of Carney Baddeley Spellman, and we represent the appellant Marisa Spooner-LeDuff. Your Honor, I'm going to hope to reserve about half of my time for rebuttal. I'll keep track of it here, of course, depending on the questions that the Court has. Yeah, please watch your time yourself. I will. But we will try to remind you. Thank you, Your Honor. And thank you for yesterday's notice that you had something on your mind on the certification. And I very much appreciate getting something like that in advance rather than directly from the bench. Let me come back to that in a moment in more detail and the fact that we have no difficulty with certification if the Court deems it appropriate. But first, I just want to make sure that the Court fully understands there was no obligation on Marisa Spooner-LeDuff and her partner, Eleanor Mitchell, and no right of the bank to put them through underwriting to lower the rate and perm the loan and then put them into foreclosure for not qualifying for a new product when they had the best product they could possibly have ever gotten and wanted to keep it. That is the essence of the breach of contract. And because there's an essence of a breach of contract on the loan documents themselves, there's no reason or need to reach the statute of frauds issue. It's an interesting issue. I'm sure the Supreme Court would love to take a look at it, but I don't think that's necessary here in order to give relief to my client. You think your client could get all the relief she wants just based on those two contractual claims, is that correct? That's what we believe, yes, Your Honor. So what did the district court say about those two claims? It didn't. It really did not say anything about that. It said that they were subsumed in the separate sale claim. And so you've read the Court's order and you've read our briefing. We think that that was a mistake by the Court because it really was a separate and distinct claim. It was laid out in the response brief. There is plenty of information supporting the damages and the other issues that came along with that. So the district court expressed some concern about what damages might be available. I think it was for the rate. Was it for the rate? Well, I think what the court was concerned with is, okay, suppose you get to a, and of course we're speculating a little bit, but let's do that. Suppose we get to a breach of contract based on a failure to provide the lower rate and perm up the loan. Then what? You still have to have these houses. But you had an 11-year interest only loan that would have expired at the end of September 2017, just a few months ago. That's a long time to be paying interest only and to be able to have rent. Remember, these are two completed townhouses in an emerging part of Seattle. Judge Gould is probably very familiar with the CD. I'm sure you're familiar with that area and that that is a turning neighborhood. This woman, Marissa Splinter-Leduff and her friend, they were just a couple of ladies trying to take advantage of that situation and provide for their families. That's what they were doing. She has fibromyalgia. She couldn't do work in the normal way. This was her way of taking care of her family. It's all in the record. And I do commend to you because, as I was mentioning to Mr. Johnson on the walk over, there are times when we all get through a case, we get caught up in the legal issues and we forget to look at some of the underlying materials. I would commend to you, and I think this may have been part of Judge Kuhnhauer's problem, Your Honor, that a couple of attachments to Ms. Splinter-Leduff's declaration. It's not in the declaration, but there are attachments to it. So she certainly entailed all the inferences from them. And I would appoint you to ER 195 to 197, which is her long December 22, 2009 email to the Bank of America complaining about the fact that they had revoked their line of credit on her house with her and her husband because of the problems with SunTrust. And SunTrust was a separate matter for her. It was not something she did with her husband. It was a separate matter. It was one of those things that caused problems. She ended up living in the house for a while. Just so I can focus you a little bit more. Okay. So if you were to prevail on the two contractual claims, the perm up and the rate, what would be the damages that you would be seeking? We would be seeking the damages for foreclosure, for losing the house and the opportunity to rent them out and then sell them when you could, when the market recovered. So that would be substantial damages, Your Honor. Okay. And some of those damages, the reason I'm pointing you to these is those kinds of points were attached to her declaration in the original summary judgment papers, and they lay out what some of the damages were, both the history of how she came to be here and the problems. So the second one is, it's a November 9, 2012 letter to SunTrust, ER 175 to 178. And frankly, you know, like I say, we sometimes as lawyers and judges, we get involved in the legal issues. They're interesting. We want to find out what's going on with them. But we have to go back to some of the basic facts. Those facts were there. There was no argument, no opportunity for Mr. Lean to raise those and have Judge Kunauer address those that way. So on the, what about on the question we posed to you? Well, as I said, Your Honor, I think it would be an interesting, it would be an interesting issue for the Supreme Court. It'd be nice for them to address that. I think they would be very sympathetic to her case. I think it does meet the compelling situation because of, you've got an oral representation that you can sell these separately. And in fact, you really almost have an impossibility, a contractual impossibility. Here you're to develop two townhouses. It's all done before they even approve the loan. You had to get the lot divided. They had to get the financing, or they were getting the financing. They had to get the lot divided. They had to know that they could get that from the city, and they had to get their contractors and their architects lined up. All that was done by people who had never even built a shack before. They went and did this. Then you have the whole project that they went through, removing hazardous waste, getting the townhouses approved, and they're told at the time that you're going to be able to sell these separately if you have to. Now, it may be that the bank just pulled off of their shelf the wrong documents, the residential documents instead of commercial, because commercial documents typically are going to allow you to sell seriatim when you've finished your development. You can do that. That's contemplated in a commercial development. This is all residential, which is one of the reasons we say that the commercial, the credit agreement, statute of frauds doesn't apply. If we were to disagree with you on that argument, wouldn't the credit agreement statute of frauds preclude this particular claim? It might preclude that particular claim, but it wouldn't preclude the claim that would allow Ms. Spooner-Leduff to hold on to the houses and sell them when they were ready or sell them when she could get a joint sale at the same time. Part of the problem, of course, is there was a huge depression in the housing market in 2009, as we all know. It didn't come back for a long time. If she could hold on to those houses, and it's in the record, she had her settlement from L&I of $245,000. She could have paid that. She could have made those payments. There's no reason she couldn't have held on to those. Lived in one, rented the other. That was fully available. I see I've got about seven minutes left, unless there's some other questions from I just have this question. I think it's already been asked, but just to make sure I've got this clear in my head. Did you say that if we were to affirm on the statute of frauds issue, which I know is not your position, but if we were to do that, but to reverse on the permanent financing and rate issues, that your clients would have a chance to recover all their damages? I might want to consult my co-counsel, Your Honor, but my first reaction is yes. I think she would be able to put in consequential damages and put in her case to allow her to get full recovery. Okay. Thank you, counsel. Your Honors, may I please the Court? My name is . . . let me make sure I've got this at the right height. My name is Charles Hansberry. I'm from the law firm of Hansberry & Jordanet out of Missoula, Montana, and I represent the Apelli SunTrust Bank in this case. First of all, before I turn to the issue that you gave your order on, because I know that's what you want to hear about, I want to clear up one misconception. There's no claim for perming up the loan, the term perming up the loan. When she took out the loan, it was a 30-year promissory note. There was no permitting up that had to occur. She had two options underneath the loan documents. She could either modify the loan at the close of construction, which would require her to requalify, or she could exercise the rate option, which she could lower her interest rate, but that would require that she not be in default. Before that time arose, she had two construction liens against the property, which were events of default. Then in July of 2009, the construction was done in May of 2009, she defaulted on making the payments. She disputes those liens, that they were valid liens. That may be the case, but they were clearly liens. That suggests that there might be a triable issue of fact on that claim. At this point, Your Honor, it may be difficult to do. That's a whole other question. Sure. Nevertheless, there was definitely these events of default that had occurred. I think the important part was, is at the time that all of this was going on, and even throughout the first part of the case, the discussion was about the ability to sell the property separately, which would clearly require a modification of the documents, because the documents themselves did not allow for separate sales. How do you respond to the, I guess it was the declaration by the loan officer that helped her arrange the loan, that helped arrange the loan? It was a ... Where he says, that was anticipated that she'd be able to sell the unit separately. Your Honor ... What are we to do with that? How does that fit into all of this? Sure. Mr. Hicks no longer worked for the bank at the time that the case arose. There has not been an awful lot of discovery and investigation in that, primarily because we think that issue is squarely addressed by the credit agreement statute of frauds, which clearly in this situation, and expressly in the statute says, if it's not in the written loan documents, it's not enforceable. What Mr. Hicks, and what Mrs. LeDuc testified in her deposition was, that was all based upon oral representations and conversations with Mr. Hicks at the time. You don't ... Is Mr. Hicks, is Mr. Hicks, is no longer with the bank? No, Your Honor. He left working for SunTrust Bank very shortly after this loan arose in 2006. He's out of Florida. It was a one-time transaction between Mrs. LeDuc and Mr. Hicks, and we've not talked to him since. Let's assume that your agent, Mr. Hicks, committed a fraudulent misrepresentation in misleading her into believing that she had the right to sell them separately. Would she have any claim against your client for fraudulent misrepresentation? A claim against Mr. Hicks, and then by virtue of ... No, against SunTrust, he was your agent. Sure, as the principal. Your Honor, if she did, that claim has long since passed under the statute of limitations. The misrepresentation would have occurred in 2006. She was clearly aware by 2009 that this had occurred. She couldn't sell them separately, and the underlying lawsuit, I believe, was filed in 2014. That's probably the reason why she never pled that claim. That claim was never alleged. No, Your Honor. Let me get directly to the issue that you brought. This issue of whether the Klinky case, the 1980 Washington Supreme Court case, provides a promissory stopple exception or claim in this situation, was briefed to the underlying court, and was ruled on by the underlying court. It can be found ... You're talking about the district court in this case. The district court. I'm sorry. Yes, Your Honor. The district court. On ER-9 and ER-10, Judge Kuhnhauer specifically addressed the Klinky case, and recognized the narrow ruling in Klinky, and then said, but on the other hand, you need to look at the Kalitz Bank v. Leonard case, a Washington appellate court case. By the way, Klinky didn't involve the credit agreement statute of frauds. It was decided a good decade before, and then instead, Judge Kuhnhauer looked at the Kalitz case, a second division case, and said that case specifically said there is no promissory stopple argument when you're dealing with the credit agreement statute of frauds. Importantly is, Judge Kuhnhauer also said that the law on this is clear. On page five of his order, it's not this court's place to reinterpret this clear statutory provision. Judge Kuhnhauer didn't believe it was necessary. I think that Judge Kuhnhauer got the decision correct. The general statute of frauds specifically says that a contract that is not in writing shall be void. It leaves room for arguments like the promissory stopple or stopple argument. In contrast, the credit agreement statute of frauds, which was passed separately from the general statute of frauds, is very specific. It says that the agreement or the obligations of the parties shall be determined solely from the written agreement and any prior contemporaneous oral agreements between the parties. Any of those prior agreements or decisions may not vary the credit agreement. It's very, very specific. That's why the Kalitz case said whatever promissory stopple claim or case law may be out there, it's foreclosed by the statute. Hasn't the Washington Supreme Court expanded the purpose exception to the statute of frauds in the real estate context? Actually no, Your Honor. There was actually another case from the Washington Appellate Court, the third division, Harwood versus Wells Fargo Bank, where they looked at whether the promissory stopple would defeat the real estate statute of frauds. Then they turned completely, not citing the Kalitz case, and said in any event, this claim is governed by the credit agreement statute of frauds and rejected a promissory stopple claim. I think what's important, and Your Honor, may I approach? That's okay. Okay. What I want to try to convince the panel is that this is an area where the law is well and it's not necessary to certify the question to the Washington Supreme Court. You've got the Kalitz case that is clearly from the second division. Kalitz has been cited by at least two first division cases, not necessarily on promissory stopple, but for rejecting oral representations contrary to the written documents under the credit agreement statute of frauds. I thought there was a case by the Washington Supreme Court called Firth that dealt with the exceptions to the statute of fraud in the real estate statute of frauds. In the Firth case, Your Honor, if I recall correctly, it first of all didn't deal with the credit agreement statute of frauds at all. The question there was whether that contract fell within the real estate statute of frauds. That was a situation where somebody was buying, they weren't buying real estate, they were buying stock in a company that held real estate. The Washington Supreme Court said it doesn't fall within the four corners of the real estate statute of frauds. It didn't find an exception to the real estate statute of frauds, it just found that it didn't apply at all. Here there's no question, and I know that they've raised this issue, but I'll address it, there's no question that the loan documents fall within the credit agreement statute of frauds. Let me turn to that issue because this is another issue that was raised on appeal, but it was never raised to the court below, to the district court below. When we originally moved for summary judgment, we argued that the credit agreement statute of frauds applied, that based on her application and her actual deposition testimony where she said it was for investment purposes and the language of the document, it clearly was a commercial or investment loan that fell within the credit agreement statute of frauds. On appeal, Mr. Miller has raised the question of whether it's not. At first what he did was he pointed to a provision in the loan document, paragraph six, that required you to occupy the premises as your principal residence. What he forgot was the one to four family rider that specifically eliminates the requirement to occupy it as your personal residence and takes a security interest on any rents and requires you to have a receiver if necessary. It takes the loan and turns it into what its purpose was, and that is as an investment and commercial loan, and that's what it was. These were two friends that came together on a joint venture, and they specifically bought it for investment, for resale, and it was a commercial loan for that purpose. Getting back to the question of certification, we don't believe that it's necessary to certify the case on this issue. The other reason why is because this was an issue that was raised, ruled upon, and never raised again on appeal. It was an abandoned issue. What this court would be doing would be essentially resurrecting an abandoned issue simply to certify it to the Washington Supreme Court. We think the law on this is sufficiently developed for that purpose. Let me address the issue real quickly about the rental claim. I think that that gets kind of conflated with this failure to perm. It was a permanent loan. It was a 30-year note. When earlier in the case, the language that would be used is you failed to perm the loan, but nobody would ever explain what does that mean and what's the ramification of that. Could I ask you a question? On that claim, what was the district court's ruling? Did the district court just say there weren't any damages on that or did the district court address the contract breach? Absolutely, Your Honor. When the case was originally filed, in the complaint, most of the paragraphs and most of the allegations deal with this inability to sell the two products separately. There is a single line almost as a side that said, you didn't give me the interest rate, but there was no damages that flowed from that. Following that, we received a demand letter from former counsel for Ms. LaDuff that outlined her damages and it was all arising out of the inability to sell the property separately. At her deposition, I put the letter in front of her and I said, Mrs. LaDuff, is there anything else I need to know about other than what's in this demand letter? She said, no, I think that's it. When we moved for summary judgment, it was about the separate sale claim. The failure to be able to get an interest rate reduction that prohibited her from renting the properties and holding on to them had never been articulated anywhere. When the court ruled originally on the summary judgment motion, it said while she has identified this as an issue, she hasn't identified what the ramifications are from it. Specifically, in her reply brief, her counsel said, we didn't get the rate reduction, we could have rented it, but cites to a declaration, paragraph 19 of her declaration, as the evidence for the ramifications for that. The problem is if you go to paragraph 19 of her declaration, it describes the separate sale claim. It doesn't describe anything with regard to the ability to hold on to the properties and sell it. Then Mr. Miller, Mrs. LaDuff let go of her former counsel and Mr. Miller stepped in. He filed his motion for reconsideration. Originally he submitted an affidavit, a declaration from Mrs. LaDuff, but again it didn't identify any evidence that she could have rented it and held on to it. We filed our response to his motion for reconsideration and then he filed a reply to the motion for reconsideration, which is the first time that he submitted any evidence indicating that she could have rented the property out and held on to it until the market improved and then she could have sold it. The other thing that we need to realize too is during some of this, she did rent the property out. On that last point, by the way, did the district court just reject that on the grounds that it didn't have to look at that issue on a reply to a rehearing motion? That is absolutely correct. Judge Kuhnhauer said, now you finally articulated an independent damages, but it's not the place to do that on a reply brief on a motion for reconsideration. That's inappropriate at that point in time. We would submit, Your Honor, that's the same ruling that you should hold as well. We didn't have the opportunity to conduct discovery on that claim because it just wasn't a claim in the case. It was all about the separate sales throughout the summary judgment hearing. Dave, thank you. If the court has any other questions, Your Honor, I appreciate it, but summary, we believe that the court can be affirmed and that this is not the case to be certifying to the Washington Supreme Court on this issue because we do think that the law, like Judge Kuhnhauer, has been sufficiently developed. Thank you, counsel. Judge Fischer, any questions for . . . No, thank you. Okay. Judge Pius, any questions? Judge Pius, do you have any questions? No, I'm sorry. I'm sorry. No, no. I'm sorry. We get back to the rebuttal, but you have a lot of time left. I hope it lets you cover everything you want to cover. Well, Your Honor, when you're the advocate, you never have enough time. The judges control the time to some extent. I'll try and be as succinct as I can, Judge Pius. First, PERM was an issue. Although their briefing says, oh, we agree it was a permanent loan for thirty years, look at ER 27, the July 9, 2006 email from Ms. Pack. It's quoted at pages 26 and 27 of the opening brief. The reason I requested documentation from you in the first place was to try and get you a lower interest rate, which is what you said you needed. In order to change the loan program or rate-updated financials are required by underwriting. She is saying right there that PERM is an issue. They refused to do that. They were saying she's confused about what the product is. Your opponent there just stood up and said, well, this was a thirty-year loan. What I'm saying is that's what they're saying in their briefs. The documents do not agree, and that's why it was part of the case. And it was part of the case from the beginning, and so was the interest rate. If you look at ER 578, which is the complaint, paragraph 2.12, we're talking about refuse to negotiate the interest rate as provided for in the loan agreement. That was part of the case from the beginning. It's in the response brief that was filed by Mr. Lean. It was clearly in the record and before the Court. In terms of what arguments were or were not raised, I will point out to the Court that the bank raised the exception to the credit agreement statute of frauds. In its reply brief at ER 127, line 23, it says the agreement is not exempt under 1936.120. That statute's in play. That statute is in play, and there's no reason it can't be addressed. There are a number of reasons and compelling reasons why this Washington Supreme Court, if they were to look at it, I think would find that there would be an exception, an equitable exception. SunTrust changed the deal. They refused to change the interest rate. They refused to treat the one loan that would convert automatically as a PERM loan. And they intended the deal to be personal by using residential forms throughout. That's kind of unusual, if this is really a commercial deal, that they use residential forms throughout. Why would they do that? Well, it's in a changing neighborhood, and guess what? They can sell it on the aftermarket. This is the time of the mortgage-backed securities, back in the mid-2000s, mid-first decade of the 2000s. The liens. Let me address the liens very briefly. Judge Paez, you're right. They were disputed by Ms. Spooner-Ledoff. We did not add any extra documentation on reconsideration, because the normal rule is you can't. You can't add new evidence, but the bank did. The bank brought up the liens the first time ever. They never say in any of their contemporaneous documents that lien problem was a reason that they were put in default. They said you didn't qualify for the new program. That is a false issue. It's a completely bogus issue. But also, I would let the Court know that SunTrust did not object to the new documents when they came in, and the new evidence. We didn't object to theirs, they didn't object to ours. It's all before the Court, and we've briefed that the Court should try and get to the right decision. Separate sale only arose after they put her in default. It was not an issue at the time in 2009 until they said we're going to put you into default. Judge Fischer, you talked about the fraud and fraudulent misrepresentation. In fact, that is essentially part of the CPA claim, which is a four-year statute of limitations, and so it is part of this case. It would be, if it went forward, something that would be addressed, but would be in the context of the CPA claim. The statute of fraud, I've addressed that. This is a very clean, clear breach of contract case. Let me give you an example of why this has to be addressed, and you can address it here. Their theory is that they can make a borrower ask for a rate reduction that they're entitled to under the contract, and then put them in line for a new product, deny them, and then say, okay, you lose. Why? If I have, if any of us have a 30-year mortgage at 5%, and the rates go down to 3.5% five years later, and we want to refi, for whatever reason, we don't qualify, do we then lose our 30-year 5% mortgage if we don't qualify for the 3.5%? That's what they're doing. That's what they're doing here. That's the logic behind what their process was. They took this couple who had made lemon out of lemonade. They made lemonade out of lemons. They took down a house in a changing neighborhood. They created beautiful houses that, in this record, according to Zill, were worth $650,000 each. They're much higher now. They're saying that, oh, sorry, we can't help you. We're not going to honor our loan. What's striking about this, when I've talked to other people, and I tell them what the circumstances of the case are, they're incredulous. They're incredulous. They say, what? The borrower made every payment for two and a half years on time? Every single one? She had to write the checks, and they did that, and then they get defaulted? Why? There's no explanation. That's why this has to be reversed, and it goes back. We think that, whether you believe it's better sent to the Washington Supreme Court, we think full relief can be provided by either path. Thank you for your time and your consideration. Thank you. I'm going to thank counsel for appellate and appellee for their fine arguments. We appreciate it. I'm going to ask counsel from Montana to be with us. Spooner-Ledoff case shall be submitted.
judges: Fisher, Gould, Paez